## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

JOSEPH LUTZ,

      Plaintiff,

v.                                                            Case No. 3:21-cv-936-MMH-PDB

LEXJAX, INC., d/b/a Mercedes-
Benz of Orange Park,

      Defendant.

_____

# O R D E R

**THIS CAUSE** is before the Court on Defendant's Motion for Summary Judgment (Doc. 64; Motion) filed by LexJax, Inc. (LexJax) on August 31, 2023. Plaintiff Joseph Lutz filed a response on September 21, 2023. <u>See</u> Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment (Doc. 66; Response). LexJax then filed a brief in reply. <u>See</u> Defendant's Reply in Support of Summary Judgment (Doc. 69; Reply), filed October 5, 2023. On July 8, 2024, the Court held a hearing on the Motion at which the parties argued their respective positions. Accordingly, this matter is ripe for review.

## I.    Background[1]

Fields Auto Group (Fields) owns numerous car dealerships throughout the United States. <u>See</u> Declaration of John Mantione at 1 (Doc. 64-1; Mantione Declaration). LexJax (d/b/a/ Mercedes-Benz of Orange Park) is one of these dealerships, and sells new and pre-owned vehicles. <u>Id.</u> at 1–2. Relevant here, LexJax has the following organizational structure: the General Manager is the highest-ranking management official at the dealership and possesses the limited authority to hire employees, recommend termination actions, conduct and administer discipline, and direct sales leads. <u>See</u> Deposition of LexJax at 9, 18, 20, 22 (Doc. 62-3; LexJax Deposition). The Sales Managers, who are supervised by the General Manager, have the limited authority to recommend the hiring and termination of employees, and also manage the dealership's sales personnel. <u>Id.</u> at 9, 26, 27. Sales personnel, in-turn, are the individuals who conduct the day-to-day sale of cars at the dealership. <u>See</u> Deposition of Joseph Lutz at 192 (Doc. 62-1; Lutz Deposition). Also located within LexJax is an independent human resources department which is responsible for all of Fields' human resource functions. <u>See</u> Deposition of Gena Jankowski at 9, 50 (Doc. 62-6; Jankowski Deposition).

---

[1] Unless otherwise noted, the facts recited herein are undisputed. For the purpose of summary judgment, the Court views all disputed facts and reasonable inferences in the light most favorable to Lutz. <u>See</u> <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (describing the summary judgment standard).

In May 2017, LexJax hired Lutz to work as a salesperson at the dealership. See Lutz Deposition at 130. At that time, Debbie Mills was the dealership's General Manager. Id. at 131. But, around October 2018, Aaron Mong took over as General Manager. Id. at 138. Throughout his employment, Lutz's direct supervisor was L.J. Walters (one of LexJax's Sales Managers). See Deposition of L.J. Walters at 26 (Doc. 62-8; Walters Deposition). And Gena Jankowski was the Director of Human Resources. See Jankowski Deposition at 9.

Upon being hired, Lutz was given LexJax's Equal Employment Opportunity, Anti-Harassment, and Non-Discriminatory Policy to review. See Lutz Deposition at 149; see also Fields Auto Group Employee Handbook (Doc. 66-1; EEO Policy). The EEO Policy forbids discrimination and harassment based on an individual's religion or national origin, and also prohibits retaliation due to an employee's complaints about alleged EEO Policy violations. See EEO Policy at 8, 10. If harassment or retaliation does occur, the EEO Policy instructs employees to bring a complaint to their supervisor, any member of management, or Jankowski. Id. at 9.

Initially, Lutz's employment at LexJax was uneventful. See Lutz Deposition at 143–44. However, when Mong became the General Manager in 2018, the environment at LexJax changed for the worse. Id. at 144. And Lutz, who is Jewish, began experiencing harassment and discrimination based on his

religion and national origin. Id. at 150–51. For instance, LexJax employees would intentionally have conversations in-front of Lutz that involved antisemitic sentiments. Id. at 152. Specifically, George Vogt (another LexJax salesperson) would say in a German accent, "Oh, we have a Jew" in reference to Lutz. Id. at 151–52. Vogt would also make comments that the Nazis "should have burned" all of the Jews; that it "would be great to have a situation over here like they had in Germany"; and he would perform a "Heil Hitler" salute in Lutz's presence. Id. at 152–153. These sort of conversations occurred approximately five to ten times throughout 2019. Id. at 179. Walters participated in these conversations, and even laughed at Vogt's comments. Id. at 151.

In addition to these conversations, Lutz experienced other forms of harassment. Id. at 176–77. In one instance, Lutz was experiencing a medical issue and "peed out a blood clot into [a] urinal" in the LexJax bathroom. Id. at 246. Vogt, who was in the restroom with Lutz at the time, got in Lutz's face and said to him, "[y]ou bled in the toilet. I'll cut your head off, Jew[.]" Id. at 246–47. On another occasion, Lutz was waiting at the dealership's front desk when Walters approached him, tossed coins on the floor, and said, "[h]ey, you're Jewish. Go pick it up." Id. at 177. On yet another occasion, Lutz walked into the LexJax office and noticed that the whiteboard used to track car sales had

Jewish symbols written on it in place of his name. <u>See</u> <u>id.</u> at 155; Exhibit Pictures of Jewish Symbols on Board (Doc. 66-9; LexJax Sales Board).

Although Lutz was distressed by these incidents, he never explicitly told anyone at LexJax that he was being harassed because he was Jewish. <u>See</u> Lutz Deposition at 155. However, Lutz did make numerous complaints to his superiors about being unfairly treated due to his work performance. <u>Id.</u> at 81. The first of these complaints occurred in November 2018 when Walters called Lutz "and just started harassing [him]" about not making enough phone calls. <u>Id.</u> at 139–40, 145–46. Lutz, upset by the way that he was being treated by Walters, met with Mong and told him that Walters had been "picking on [him]." <u>Id.</u> at 158. During this meeting, Lutz never told Mong that Walters' harassment was based upon his religion. <u>Id.</u> at 142. In fact, neither Walters nor Mong knew that Lutz was Jewish at the time. <u>Id.</u> Then, in January 2020, Sean Dowling (LexJax's sales manager for pre-owned vehicles) issued Lutz a written discipline for failing to meet his objective quota for weekly sales calls. <u>Id.</u> at 207. Lutz filed a formal grievance in response to Dowling's write-up, but in the grievance he made no mention that the write-up had anything to do with him being Jewish. <u>Id.</u> at 207, 211. Finally, in February 2020, Lutz met with Jankowski and complained about how Walters had been "writing [him] up for not making enough phone calls." <u>Id.</u> at 100–01. In this meeting, Lutz told

Jankowski that Walters had been "pick[ing] on" him. Id. at 99. But never told her that he was being picked on because he was Jewish. Id.

Despite the work environment at LexJax, Lutz continued to exceed sales expectations by selling the most cars in 2019, and was awarded the "Top Dog Salesperson of the Year" award for his efforts. Id. at 218. Nonetheless, the environment at LexJax caused Lutz to become emotionally distressed. Id. at 243. And when COVID-19 struck Florida, Lutz decided to take COVID leave, and stopped coming into the dealership. Id. at 184. Despite deciding to take the leave, Lutz intended to return to LexJax once it was safe to do so. Id. at 46–47. However, in April 2020, Lutz informed Mong that he would not be returning to the dealership, and that he was quitting his job. Id. at 94, 215.

Eight months later, on December 30, 2020, Lutz filed a charge with the Equal Employment Opportunity Commission (EEOC). See Charge of Discrimination at 1 (Doc. 62-13; EEOC Charge). In his EEOC charge Lutz alleged that LexJax "promoted and condoned a hostile work environment in which [he] was harassed on the basis of [his] religion and ancestry on an ongoing basis" and that he "faced retaliation due to [his] complaints about" this harassment. EEOC Charge at 1. The EEOC issued Lutz a Notice of Right to Sue, and he subsequently brought this action. See Complaint ¶ 39 (Doc. 1).

## II.    Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[2] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere

_____

[2] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 Advisory Committee's Note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

In citing to Campbell, the Court notes that it does not rely on unpublished opinions as binding precedent, but that they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." <u>Kesinger ex rel. Est. of Kesinger v. Herrington</u>, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. <u>See</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248; <u>see also</u> <u>McCormick v. City of Ft. Lauderdale</u>, 333 F.3d 1234, 1243 (11th Cir. 2003) ("The mere existence of some factual dispute will not defeat summary judgment unless the factual dispute is material to an issue affecting the outcome of the case."). In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing

summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## III.    Discussion

Lutz asserts six claims against LexJax: (1) religious harassment and discrimination in violation of Title VII; (2) discrimination in violation of 42 U.S.C. § 1981; (3) religious harassment and discrimination in violation of the Florida Civil Rights Act (FCRA); (4) retaliation in violation of Title VII; (5) retaliation in violation of the FCRA; and (6) retaliation in violation of 42 U.S.C. § 1981. <u>See</u> Complaint at 12–20. LexJax moves for summary judgment on all counts. Motion at 12. As to the discrimination claims, LexJax argues that Lutz has failed to show the existence of a hostile work environment and that summary judgment should be entered in its favor as to Counts I, II, and III. <u>Id.</u> at 17. As to the retaliation claims, LexJax contends that Lutz has failed to make a prima facie showing for a retaliation claim and that summary judgment should be entered in its favor as to Counts IV, V, and VI. <u>Id.</u> at 13. For his part, Lutz argues that a reasonable jury could find that a hostile work environment existed and that he was retaliated against, Response at 10, 17, and therefore requests that summary judgment be denied. <u>Id.</u> at 20. For the reasons discussed below, the Court finds that the Motion is due to be granted in-part and denied in-part.

###### A.      Hostile Work Environment

In Counts I, II, and III Lutz alleges that LexJax discriminated against him by creating a hostile work environment in violation of Title VII, 42 U.S.C. § 1981, and the FCRA. See Complaint at 12–15. Because each of these claims are subject to the same standards of proof and employ the same analytical framework, the Court will analyze them collectively. See Bryant v. Jones, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009) ("[H]ostile work environment claims, brought under the Equal Protection Clause, 42 U.S.C. § 1981, or Title VII . . . are subject to the same standards of proof and employ the same analytical framework."); see also Harper v. Blockbuster Ent. Corp., 139 F.3d 1385, 1387 (11th Cir. 1998) ("The Florida courts have held that decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act, because the Florida act was patterned after Title VII."). To establish a prima facie hostile work environment claim, a plaintiff must show:

> (1) [T]hat he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002). In the Motion, LexJax does not dispute that Lutz (being Jewish) belongs to a protected group, that he was subject to unwelcome harassment, and that this harassment

was because he is Jewish. However, LexJax does argue that Lutz's alleged harassment was not sufficiently severe or pervasive as to alter the terms and conditions of his employment and that it cannot be held liable for this harassment. Motion at 18, 24. In the alternative, LexJax contends that even if Lutz can establish his hostile work environment claim, it is entitled to summary judgment on its <u>Faragher</u> defense. <u>Id.</u> at 23.[3] The Court will address each argument in turn.

i. Severe or Pervasive

LexJax argues that Lutz has failed to show that his alleged harassment was sufficiently severe or pervasive as to alter the terms and conditions of his employment. <u>Id.</u> at 18. Importantly, Title VII does not "operate as a 'civility code for the American workplace.'" <u>Copeland v. Georgia Dep't of Corr.</u>, 97 F.4th 766, 775 (11th Cir. 2024) (quoting <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 80 (1998)). For this reason, the "severe-or-pervasive element ensures that a hostile work environment claim remains faithful to the text of Title VII" by making "actionable only a work environment sufficiently suffused with 'intimidation, ridicule, and insult . . . [as] to alter the conditions of the victim's

---

[3] In <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807 (1998), the Supreme Court held that a defendant-employer may avoid liability for the creation of a hostile work environment if it can show that it: "[1] exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and [2] that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."

employment.'" Id. (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

To satisfy the severe or pervasive requirement, a plaintiff must satisfy both an

objective and subjective component. Id. As to the subjective component, a

plaintiff must show that he "'subjectively perceived' the hostile work

environment 'to be abusive.'" Id. (quoting Miller, 277 F.3d at 1276) (alteration

omitted). Whereas the objective component requires a plaintiff to show "'an

environment that a reasonable person would find hostile or abusive'—that is,

one where severe or pervasive harassment of the victim occurs." Id. (quoting

Miller, 277 F.3d at 1276). In the Motion, LexJax does not dispute that Lutz

subjectively perceived his harassment to be abusive. Therefore, the only

question is whether the harassment was objectively abusive. In answering this

question, the Court considers the following factors:

> (1) the frequency of the conduct; (2) the severity of the conduct; (3)
> whether the conduct is physically threatening or humiliating, or a
> mere offensive utterance; and (4) whether the conduct
> unreasonably interferes with the employee's job performance.

Miller, 277 F.3d at 1276. "Although these factors guide [the Court's] inquiry,

they are neither elements nor requirements." Copeland, 97 F.4th at 775.

Instead, the Court's "task is to 'determine under the totality of the

circumstances whether the harassing conduct . . . alter[ed] the terms or

conditions of the plaintiff's employment.'" Id. at 775–76 (quoting Mendoza v.

Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999)). And "no single factor" is

dispositive in making this determination. <u>Fernandez v. Trees, Inc.</u>, 961 F.3d 1148, 1155 (11th Cir. 2020).

Before considering whether Lutz has established a genuine issue of material fact on the question of whether the conduct to which he was subjected was sufficiently severe or pervasive to establish a prima facie case, the Court notes that much of LexJax's arguments on this issue are misplaced. This is so because in making its arguments, LexJax relies on contradictory testimony given by other LexJax employees in their depositions. But in resolving the Motion, the Court makes no credibility assessments, accepts Lutz's testimony as true, and views all reasonable inferences in his favor.

<u>Frequency</u>. The first factor—the frequency of the alleged conduct—weighs in favor of Lutz. Although there is no "'magic number' of instances of harassment sufficient to qualify as frequent[,]" <u>Copeland</u>, 97 F.4th at 776 (quoting <u>Miller</u>, 277 F.3d at 1276), the Eleventh Circuit has "treated 15 instances of harassment in four months as 'not infrequent,' 'more than 10' specific instances in two months as 'frequent,' and five instances over an 11-month period as 'too infrequent[.]'" <u>Id.</u> (internal quotations and citations omitted). Wherever this boundary may lie, a reasonable jury could find that Lutz's alleged harassment surpassed it. <u>Id.</u> For instance, Lutz testified that Walters and Vogt purposefully engaged in antisemitic conversations in his presence approximately five to ten times throughout 2019. <u>See</u> Lutz Deposition

at 151, 179. In addition to these conversations, Lutz also testified that there was an incident where Walters dropped coins on the floor and derisively told him to pick them up because he was Jewish; that someone at LexJax had written Jewish symbols on the dealership's sales board in place of his name; and that in the LexJax bathroom Vogt told him that, "I'll cut your head off, Jew." Id. at 164, 177, 247. Viewing these facts in their totality, a reasonable jury could find that Lutz was subjected to frequent discrimination while employed at LexJax during 2019. See Copeland, 97 F.4th at 777.

Severity. The second factor—the severity of the alleged conduct—also weighs in Lutz's favor. As explained by the Supreme Court, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Oncale, 523 U.S. at 81 (quoting Harris, 510 U.S. at 23). This "inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." Id. But also relevant is whether the harassment "involves the participation of supervisors rather than solely peers or subordinates." Copeland, 97 F.4th at 777.

Here, Lutz experienced harassment from both his direct supervisor (Walters) and his peer (Vogt). As noted above, according to Lutz, Walters dropped coins on the floor and derisively told Lutz to pick them up because he was Jewish. Walters also participated in the antisemitic conversations that

occurred in front of Lutz, and would laugh at Vogt's statements that the Nazis "should have burned" all of the Jews; that it "would be great to have a situation over here like they had in Germany"; and that "Hitler killed a lot of Jews over in Germany and other countries over there and that he wished it would happen here in our country, clean -- cleanse the country of Jews." Lutz Deposition at 152–153, 260. Although LexJax contends that these were merely "[i]solated incidents of generic inappropriate conversations" a reasonable jury could conclude otherwise. Motion at 21; see also Miller, 277 F.3d at 1277 ("[The alleged] conduct rose above the level of off-handed comments in the course of casual conversation that the Supreme Court has refused to find actionable.").

Physically Threatening or Humiliating. The third factor—whether the alleged conduct is physically threatening or humiliating—weighs in Lutz's favor as well. First, a reasonable jury could find that Lutz's alleged harassment was physically threatening. Notably, Vogt got in Lutz's face in the dealership bathroom and said, "I'll cut your head off, Jew." Lutz Deposition at 246–47. Vogt also made statements in front of Lutz expressing his support for the cleansing of Jews from the United States. See id. at 260. Second, a reasonable jury could find that Lutz's alleged harassment was humiliating. As noted by the Eleventh Circuit, "harassment that occurs 'in the presence of coworkers' is especially humiliating." Copeland, 97 F.4th at 779 (quoting Fernandez, 961 F.3d at 1155). To this point, Walters and Vogt's antisemitic conversations did not occur in

private, but on the dealership floor in front of other employees and customers. See Lutz Deposition at 151. Additionally, LexJax's sales board—which was visible to everyone at the dealership—had Jewish symbols written on it in place of Lutz's name. See Deposition of Aaron Mong at 72 (Doc. 62-2; Mong Deposition). Based on these facts, a reasonable jury could find that Lutz's alleged harassment was both physically threatening and humiliating.

Job Performance. The fourth factor—whether the alleged conduct unreasonably interfered with the employee's job performance—is likely neutral. As explained by the Supreme Court, "Title VII comes into play before the harassing conduct leads to a nervous breakdown." Harris, 510 U.S. at 22. This makes sense as a "discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." Id. Accordingly, "harassment need not be . . . so extreme that it produces tangible effects on job performance in order to be actionable." Miller, 277 F.3d at 1277 (citing Harris, 510 U.S. at 22). Here, Lutz testified that he was "emotionally worn out from the way [that he] was being treated" at LexJax. Lutz Deposition at 33. But, he also sold the most cars in 2019 and was awarded the "Top Dog Salesperson of the Year Award" because of his performance. Id. at 218. Therefore, on balance, this factor is likely neutral.

For the reasons stated above, a reasonable jury could find that Lutz's harassment was frequent, severe, and physically threatening and humiliating. Although the impact of this harassment on Lutz's job performance is likely neutral, a reasonable jury could conclude that these factors, in their totality, support a finding that Lutz's alleged harassment was sufficiently severe or pervasive as to materially alter the terms and conditions of his employment. See Miller, 277 F.3d at 1277.

### ii. Direct or Vicarious Liability

LexJax next argues that it cannot be held liable for Lutz's alleged harassment. Motion at 24. To survive summary judgment, Lutz "must provide evidence from which a reasonable jury could conclude that [LexJax] was liable for the harassment [he] suffered." Smelter v. S. Home Care Servs. Inc., 904 F.3d 1276, 1287 (11th Cir. 2018). "As an initial matter, the basis of an employer's liability for a hostile work environment depends on whether the harasser is the victim's supervisor or merely a co-worker." Gray v. Koch Foods, Inc., 580 F. Supp. 3d 1087, 1113 (M.D. Ala. 2022). [4] Liability "for a supervisor's [] harassment can either be established directly or vicariously, while employer liability for a co-worker's harassment can only be established directly." Id.

---

[4] The Court notes that although decisions of other district courts are not binding, they may be cited as persuasive authority. See Stone v. First Union Corp., 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects").

(citing <u>Minix v. Jeld-Wen, Inc.</u>, 237 F. App'x 578, 579, 583 (11th Cir. 2007)).[5] Direct liability "can be established through evidence of two types of notice: actual and constructive." <u>Smelter</u>, 904 F.3d at 1287. "Actual notice is established by proof that management knew of the harassment, whereas constructive notice will be found where the harassment was so severe and pervasive that management should have known of it." <u>Id.</u> (quoting <u>Miller</u>, 277 F.3d at 1278). On the other hand, an employer can be "subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." <u>Ellerth</u>, 524 U.S. at 765.

LexJax contends that it cannot be held directly liable because "Mong and Walters are not high enough up in the corporate ladder for" it to have actual notice of Lutz's harassment. Motion at 24. This argument is unavailing. The Eleventh Circuit has held that when an employer's anti-harassment policy "clearly specifies the steps an employee should take to alert the employer of sexual harassment, the employer has, by the policy, 'itself answered the

---

[5] In <u>Vance v. Ball State Univ.</u>, 570 U.S. 421 (2013), the Supreme Court explained that despite the colloquial use of the term "supervisor," a "supervisor" for the purposes of Title VII is one who has been empowered "to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" <u>Id.</u> at 431 (quoting <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998)). In the Motion, LexJax does not dispute that Walters meets this criteria. Thus, for the purposes of this Order, the Court finds that Walters qualifies as a "supervisor" under Title VII.

question of when it would be deemed to have notice of the harassment sufficient to obligate it or its agents to take prompt and appropriate remedial measures.'" Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1300 (11th Cir. 2000) (quoting Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1364 (11th Cir. 1999)). Thus, "if an employer has a company policy specifically designating the person or persons to whom an employee should report instances of suspected . . . harassment, once the employee complains to the designated person or persons, the employer is deemed to have actual notice of the harassment." Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir. 2000) (citing Coates, 164 F.3d at 1364). Here, LexJax's EEO Policy states that an employee may report discriminatory conduct to the "employee's supervisor; the Human Resources Director; [or] any officer or member of management." EEO Policy at 9 (alterations omitted). As Walters was Lutz's direct supervisor, he was specifically designated by LexJax to receive employee complaints regarding EEO Policy violations. "Therefore, by this policy, [LexJax] established that when [Walters] was contacted regarding harassment, it then had been given notice sufficient to obligate it to make a prompt corrective response." Madray, 208 F.3d at 1300. This is true regardless of Walters' standing in the LexJax

corporate hierarchy, as the EEO Policy's own terms designated him as one who could place the corporation on notice of workplace misconduct.[6]

Since LexJax's EEO Policy designated Walters as someone who workplace misconduct could be reported to, the Court must next determine whether Walters was made aware of Lutz's alleged harassment. In answering this question, the Eleventh Circuit's opinion in <u>Smelter v. S. Home Care Servs. Inc.</u>, 904 F.3d 1276 (11th Cir. 2018), is instructive. In <u>Smelter</u>, the Eleventh Circuit considered whether an employer had actual notice of an employee's harassment when a supervisor observed the harassment and found it to be funny. <u>Id.</u> at 1287. The Eleventh Circuit held that the employer did have actual notice, despite the employee never making a formal complaint, reasoning that:

> Of course, [the supervisor] could not have found the racist remarks humorous if she had not overheard them. The record thus contains evidence that [the supervisor] had actual notice of the hostile work environment despite [the plaintiff's] failure to report it. And because [the supervisor] was [the plaintiff's] supervisor, we can impute [the supervisor's] notice to [the employer].

<u>Id.</u> Applying <u>Smelter's</u> reasoning, a sister court explained that, "[i]f a supervisor's observation of harassment, even in the absence of any complaint or report, is sufficient to constitute actual notice, then certainly a supervisor's

---

[6] Indeed, if LexJax is correct that Walters lacks the authority to place it on actual notice of workplace misconduct, then the protections within the EEO Policy would be illusory. Under this reasoning, LexJax would be allowed to delineate the steps that an employee must take to report instances of misconduct, but when an employee follows those established procedures, disclaim that they have any force and effect.

observation of harassment, and subsequent participation in that harassment, can likewise constitute actual notice." Gray, 580 F. Supp. 3d at 1115 (footnote omitted). Here, Walters was Lutz's direct supervisor and was specifically designated by LexJax to receive complaints regarding workplace misconduct. According to Lutz, not only did Walters observe Lutz being harassed by Vogt, but he actively participated in this harassment and found Vogt's comments to be funny.[7] A reasonable jury could therefore find that Walters had knowledge of Lutz's alleged harassment, despite Lutz never making any complaint, and that this knowledge is sufficient to hold LexJax directly liable.[8]

In sum, a reasonable jury could find that Lutz's harassment was sufficiently severe or pervasive as to alter the terms and conditions of his employment, and that LexJax had actual notice of this harassment and can therefore be held directly liable. For this reason, a reasonable jury could conclude that LexJax subjected Lutz to a hostile work environment.

---

[7] Notably, the LexJax EEO Policy states that "[i]f an employee experiences or witnesses any conduct that he or she believes is inconsistent with this policy, the Company expects the employee to notify immediately one or more of the people designated below." EEO Policy at 9.

[8] As a reasonable jury could find that LexJax had actual notice of Lutz's alleged harassment, the Court does not "address whether a reasonable jury could also conclude that [LexJax] had constructive notice[,]" nor does the Court address whether LexJax can be held vicariously liable. Smelter, 904 F.3d at 1288.

iii. Faragher Defense

LexJax argues that even if Lutz has made a prima facie hostile work environment claim it is entitled to summary judgment on its <u>Faragher</u> defense. Motion at 23. In <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998), the Supreme Court held that an employer is automatically liable for a supervisor's harassment when it "culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." <u>Id.</u> at 808. When no such action has occurred, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." <u>Id.</u> at 807. However, an employer may avoid vicarious liability by showing that it: "[1] exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and [2] that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." <u>Id.</u> "Both elements must be satisfied for the defendant-employer to avoid liability, and the defendant bears the burden of proof on both elements." <u>See</u> <u>Frederick v. Sprint/United Mgmt. Co.</u>, 246 F.3d 1305, 1313 (11th Cir. 2001).

At the outset, although LexJax has the burden of showing that the <u>Faragher</u> defense applies, LexJax spends little time in the Motion addressing it. <u>See</u> Motion at 23–24. LexJax's principal argument is that because its EEO

Policy prohibited discrimination, and Lutz failed to take advantage of this Policy, <u>Faragher</u> applies. <u>Id.</u> While this argument certainly bears on whether Lutz "unreasonably failed to take advantage of any preventive or corrective opportunities provided by" LexJax, <u>Faragher</u>, 524 U.S. at 807, it does not address whether LexJax "exercised reasonable care to prevent and correct promptly" the harassment that Lutz faced. <u>Id.</u> As explained above, a reasonable jury could find that LexJax had actual notice of Lutz's harassment. Notably, the Eleventh Circuit has held that:

> [I]n regard to both the direct liability standard and the employer's affirmative defense to vicarious liability, the employer's notice of the harassment is of paramount importance; if the employer had notice of the harassment (which is required for direct liability but not required for vicarious liability), then it is liable unless it took prompt corrective action.

<u>Dees v. Johnson Controls World Servs., Inc.</u>, 168 F.3d 417, 422 (11th Cir. 1999). Since LexJax has not presented any evidence that it took prompt corrective action to address Lutz's harassment, the Court, at this juncture, cannot find that it is entitled to the <u>Faragher</u> defense.

In sum, because a reasonable jury could find that LexJax subjected Lutz to a hostile work environment, and because LexJax has failed to satisfy both elements of its <u>Faragher</u> defense, the Motion is due to be denied as to Counts I, II, and III.

### B.    Retaliation

In Counts IV, V, and VI Lutz alleges that he was unlawfully retaliated against in violation of Title VII, the FCRA, and 42 U.S.C. § 1981. See Complaint at 16–20. "Because retaliation claims under Title VII, the FCRA, and § 1981 are analyzed under the same framework, the Court discusses them together and their outcomes are the same." Eliassaint v. RTG Furniture Corp., 551 F. Supp. 3d 1293, 1310 (M.D. Fla. 2021). To make a prima facie showing of retaliation, a plaintiff must show: "(1) that [he] engaged in statutorily protected conduct; (2) that [he] suffered [an] adverse employment action; and (3) that there is 'some causal relation' between the two events." Alvarez v. Royal Atl. Devs., Inc., 610 F.3d 1253, 1268 (11th Cir. 2010) (quotation omitted). LexJax argues that Lutz has failed to satisfy each element, and that summary judgment should therefore be entered in its favor on his retaliation claims. Motion at 13.

LexJax first argues that Lutz has failed to show that he engaged in statutorily protected conduct. Id. at 14. "Title VII's anti-retaliation provision prohibits retaliation when an employee 'oppos[es] any practice made an unlawful employment practice by [Title VII.]'" Howard v. Walgreen Co., 605 F.3d 1239, 1244 (11th Cir. 2010) (quoting 42 U.S.C. § 2000e–3(a)).[9] Under Title

---

[9] Title VII also prohibits retaliation against anyone who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." Howard, 605 F.3d at 1244 (quoting 42 U.S.C. § 2000e–3(a)). Lutz does not argue that this occurred. Thus, the Court does not address this issue.

VII, "[p]rotected activities include the filing of a formal complaint, the voicing informally of a complaint to superiors, or the use of an employer's internal grievance procedure to report alleged discrimination." Bolton v. Baldwin Cnty. Pub. Sch., 627 F. App'x 800, 803 (11th Cir. 2015) (citing Rollins v. State of Fla. Dep't of L. Enf't, 868 F.2d 397, 400 (11th Cir. 1989)). "However, the statute's protections only reach individuals who 'explicitly or implicitly communicate[ ] a belief that the practice constitutes unlawful employment discrimination.'" Furcron v. Mail Centers Plus, LLC, 843 F.3d 1295, 1311 (11th Cir. 2016) (quoting EEOC Compl. Man. (CCH) § 8–11–B(2) (2006)). Nonetheless, "an employee need not use the magic words '[religion]' or '[national origin]' to bring [his] speech within Title VII's retaliation protections[.]" Livingston v. Marion Bank & Tr. Co., 30 F. Supp. 3d 1285, 1314 (N.D. Ala. 2014) (quoting Sitar v. Indiana Dep't of Transp., 344 F.3d 720, 727 (7th Cir. 2003)). Instead, "[the] complaint must reasonably convey to the employer an allegation of employment discrimination based upon [religion or national origin] rather than merely a claim related to personal animosity, unfairness, or indecorous treatment generally." Id. (citing Coutu v. Martin Cnty. Bd. of Cnty. Com'rs, 47 F.3d 1068, 1075 (11th Cir. 1995)).

Here, Lutz does not specify what statutorily protected conduct he engaged in. Instead, he argues that because Mong "was involved in and had knowledge of [his] ongoing harassment" a "reasonable juror could conclude that Mong

understood [his] complaints to be about the ongoing discriminatory and retaliatory harassment" he was experiencing. Response at 18 (emphasis in original). Thus, it appears as though Lutz is arguing that his complaints to Mong about being "picked on" is the statutorily protected conduct. This argument is unavailing. Notably, Lutz never complained to Mong—or anyone at LexJax—that he was being harassed, discriminated against, or even treated differently <u>because</u> he was Jewish. Instead, Lutz only raised general complaints about being treated unfairly with regard to his sales call requirements.

For instance, in November 2018, Walters called Lutz and "started harassing [him]" about not making enough phone calls. Lutz Deposition at 140, 145–46. Upset by this incident, Lutz met with Mong and complained that he was being "pick[ed] on" by Walters. <u>Id.</u> at 158. During this meeting, Lutz never told Mong that Walters was harassing him because he was Jewish. <u>Id.</u> at 157–58. In fact, neither Mong nor Walters knew that Lutz was Jewish at the time. <u>Id.</u> at 142.[10] Next, in January 2020, Dowling wrote up Lutz for failing to

---

[10] Lutz testified that there were additional instances where he complained to Mong about Walters' behavior. <u>See</u> Lutz Deposition at 138 ("I told Aaron Mong numerous times about stuff that [Walters] was doing to me."). However, during these conversations, Lutz never told Mong that Walters was harassing him because he was Jewish—only that he was being harassed for not making enough sales calls. <u>See id.</u> at 154–55 ("So when I went to . . . [Mong], I would tell him about the harassment, you know, 'This guy keeps harassing me. He's picking on me about phone calls. I'm selling cars. I mean, what else can I do?'"). Indeed, Lutz concedes that in these conversations he never explicitly told Mong that he was being harassed based on his religion or national origin. <u>See id.</u> at 157–58 ("**Q**: Did you ever mention anything about being Jewish when you complained to [Mong]? **A**: No. When I complained to [Mong], I did say, 'He's picking on me.'"); <u>id.</u> at 155 ("**Q**: So you never reported the religion part? **A**: No.").

meet his weekly sales call objectives. Id. at 205–06. Lutz filed a formal grievance in response to this write-up, but in the grievance did not mention that he was being harassed because he was Jewish. Id. at 207, 211. Nor could he, as he admits that Dowling's write-up had nothing to do with his religion or national origin. Id. at 211. Finally, in February 2020, Lutz met with Jankowski to complain about how Walters had been "writing [him] up for not making enough phone calls." Id. at 100. In this meeting, Lutz complained to Jankowski that Walters had been "pick[ing] on" him. Id. at 99. But never told her that he was being picked on because he was Jewish. Id. Indeed, Jankowski "didn't have any knowledge" that Lutz was being harassed or discriminated against because of his religion or national origin. Id.

Thus, as Lutz's complaints were only about being unfairly treated due to his sales performance, these complaints could not have reasonably conveyed to LexJax that he was being discriminated against because he was Jewish. See Livingston, 30 F. Supp. 3d at 1314 ("[A] complaint must reasonably convey to the employer an allegation of employment discrimination . . . rather than merely a claim related to personal animosity, unfairness, or indecorous treatment generally."). For this reason, no reasonable jury could find that Lutz engaged in statutorily protected conduct. As such, his retaliation claims necessarily fail, and the Court does not address the remaining elements. See Howard, 605 F.3d at 1244 ("[Lutz's] claim fails as a matter of law . . . because

he did not engage in protected conduct."). Accordingly, LexJax is entitled to summary judgment on Counts IV, V, and VI of the Complaint.

## IV.    Conclusion

Upon review of the record and the parties' arguments, the Court finds as follows. As to Lutz's discrimination claims (Counts I, II, and III) summary judgment is due to be denied because a reasonable jury could find that Lutz's harassment during 2019 was sufficiently severe or pervasive as to materially alter the terms and conditions of his employment and that LexJax is directly liable for this harassment. Additionally, LexJax has failed to show, at this juncture, that it is entitled to the <u>Faragher</u> defense. As to Lutz's retaliation claims (Counts IV, V, and VI) summary judgment is due to be entered in LexJax's favor as Lutz has failed to show that he engaged in statutorily protected conduct.

Accordingly, it is

**ORDERED:**

1. Defendant's Motion for Summary Judgment (Doc. 64) is **GRANTED in-part** and **DENIED in-part**.

2. The Motion is **denied** with respect to Counts I, II, and III of the Complaint.

3. The Motion is **granted** with respect to Counts IV, V, and VI of the Complaint.

4. The Court will withhold the entry of final judgment until resolution of the remaining claims against LexJax.

5. The parties are **directed** to confer, and by **August 19, 2024**, advise the Court whether they believe a settlement conference with a United States Magistrate Judge would be beneficial in this case.

**DONE AND ORDERED** in Jacksonville, Florida this 30th day of July, 2024.

**MARCIA MORALES HOWARD**
United States District Judge

Lc32

Copies to:
Counsel of Record